IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICKY KOEL,

    Plaintiff,

    v.

CITIZENS MEDICAL CENTER, INC., et al.,

    Defendants.

Case No. 2:21-cv-2166-HLT

## MEMORANDUM AND ORDER

Plaintiff Ricky Koel severely injured his right eye while repairing a fence. He went to Citizens Medical Center ("CMCI"), a small rural hospital in Colby, Kansas, for emergency care and treatment. The on-call Emergency Department ("ER") physician evaluated Plaintiff's condition and called a local optometrist for consultation. Plaintiff was released from the ER with medication and directions to see an ophthalmologist in Garden City the following morning. The ophthalmologist referred Plaintiff to a retina specialist in Wichita for possible same-day surgery. Plaintiff had the surgery, during which the surgeon diagnosed and repaired an occult ruptured globe. But Plaintiff ultimately lost vision in the injured eye.

Plaintiff brings state-law medical malpractice claims against CMCI, the ER physician, and the optometrist. He also brings a federal claim against CMCI. The federal claim is for violation of the Emergency Medical Treatment and Labor Act ("EMTALA"). Plaintiff claims CMCI violated EMTALA in two ways: (1) by failing to conduct an appropriate medical screening examination and (2) by releasing him without stabilizing his emergency medical condition.

Both parties filed motions for partial summary judgment on Plaintiff's EMTALA claim. Docs. 122, 124. The Court grants CMCI's motion and denies Plaintiff's because CMCI provided

Plaintiff with an appropriate medical screening examination within the capabilities of its ER. Any violations of CMCI's policies and procedures for screening were de minimis. And no reasonable jury could find that CMCI knew Plaintiff had an emergency medical condition when it released Plaintiff with an ophthalmologist appointment the next morning.

This case is at its heart a state-law medical malpractice case. Plaintiff attempts to mold it into a federal claim but fails. EMTALA is intended to stop "patient dumping" by requiring ERs to complete medical screening examinations within their capabilities and to stabilize patients with emergency medical conditions before transferring or releasing them. CMCI complied with both federal requirements. CMCI completed a medical screening examination within its capabilities. And CMCI had no duty to stabilize Plaintiff beyond what it did because CMCI did not know Plaintiff had an emergency medical condition that required something different. The Court is saddened by Plaintiff's loss of vision. But whether CMCI made a mistake in its diagnosis and treatment is a matter of state law. It does not federalize this case.

## I.   BACKGROUND

### A.   Plaintiff's Injury

Plaintiff was repairing a farm fence with pliers on April 10, 2019, when a straight wire snapped. Either the pliers or the wire hit his right eye. Plaintiff was knocked unconscious. He woke with bloody drainage from the eye. He was vomiting from the extreme pain and could not see out of that eye.

Plaintiff had an "occult ruptured globe."[1] This injury could not be seen by the naked eye and was not obvious. But a CT scan can sometimes pick up a ruptured globe. The standard of

---

[1] The term "ruptured globe" is used fairly interchangeably with "open globe" in the record. They are both in contrast to a "closed globe."

ophthalmology care for a ruptured globe is to send the patient to surgery if a ruptured globe is suspected and not ruled out. The only treatment for a ruptured globe is to surgically close any open site found in the eye. It is important to close a ruptured globe as soon as possible because vision loss can occur.

### B. CMCI's ER Treatment

Plaintiff reported to CMCI's ER and received prompt attention.

#### 1. Medical Screening Examination

Plaintiff was immediately seen by Alyse Moss, a triage nurse at CMCI. A physician's assistant, Allie Keller, then took over. Keller suspected a ruptured globe or a corneal or eyelid laceration. She called and left a message for Luther Fry, MD. Dr. Fry is a long-time ophthalmologist with an office in Garden City. Dr. Daniel Kuhlman, CMCI's on-call ER hospitalist, saw Plaintiff within ten minutes of his arrival. Dr. Kuhlman is board-certified in family medicine and is a member of CMCI's medical staff. He has no training in ophthalmology.

Dr. Kuhlman examined Plaintiff's right eye with an ophthalmologic scope and ordered a CT scan. Dr. Kuhlman was concerned that Plaintiff might have a ruptured globe. It was in the differential diagnosis. But Dr. Kuhlman also knew that treatment for a ruptured globe was not within CMCI's capability.

Dr. Kuhlman called Sam Funk, OD. Dr. Funk is a local optometrist who agreed to assist in Plaintiff's evaluation. Dr. Funk arrived at the ER just before Plaintiff's CT scan was performed. He used a slit lamp to examine Plaintiff's eye after the CT scan. But the ruptured globe could not be seen with the slit lamp because Plaintiff's eye was filled with blood, hiding where the rupture occurred. And Dr. Funk performed a Seidel test. This test is designed to identify some ruptured globes. It was negative but did not rule out a ruptured globe. Dr. Funk ruled out an open globe

3

from what he could see. He stated in his deposition that his diagnosis was that it was a closed globe (from what he could see) but that Plaintiff needed more treatment for "another issue, lens vitreous retinal, or globe." Doc. 123-18 at 27.

Dr. Funk spoke with Dr. Fry on the phone for three minutes. The content of the conversation is disputed. Whether Dr. Kuhlman overheard the conversation is also disputed. But Dr. Funk did not tell Dr. Fry about the CT scan. Dr. Fry agreed to see Plaintiff the next morning in Garden City.

Dr. Funk left the hospital before Dr. Kuhlman received the results of the CT scan. The radiologist told Dr. Kuhlman that the CT scan showed a "right intraocular hemorrhage and possible component of right globe rupture." Docs. 123-11 at 4; 123-2 at 14. The CT report also showed a finding that "[t]he margins of the right globe are somewhat irregular, and some degree of right globe rupture possible." Doc. 123-2 at 14. Dr. Kuhlman did not tell Dr. Fry or Dr. Funk about the results. Dr. Kuhlman testified in deposition that his habit would have been to get Dr. Fry whatever information he could so Dr. Fry would have it available.

### 2.   Plaintiff's Emergency Medical Condition and Release

Dr. Kuhlman shared the CT scan results with Plaintiff. He told Plaintiff that a risk of a possible ruptured globe is a loss of vision. He discussed with Plaintiff possible transfer to another facility because CMCI didn't have full assessment capacity. But Dr. Kuhlman did not recommend that Plaintiff transfer to another facility. He expressed concern in his deposition with transporting by ambulance or air transport if it turned out Plaintiff did not have a globe injury at all. Dr. Kuhlman also testified in his deposition that the CT scan results coupled with the other information he had at the time did "not change [his] plan for the patient." Doc. 123-15 at 23-25.

4

Plaintiff's discharge instructions noted multiple medications Plaintiff was to take and instructed Plaintiff to see Dr. Fry the next day at 9:30 a.m. Dr. Fry saw Plaintiff the next morning. He observed blood in the back of Plaintiff's eye and sent Plaintiff directly to Wichita to see a retina specialist. The retina specialist, Dr. Brooke Nesmith, conducted surgery on Plaintiff the evening of April 11 and diagnosed an occult ruptured globe. Plaintiff lost sight in that eye.

### C.     Plaintiff's Ability to Pay

Plaintiff had no insurance. He was marked "self-pay" on his medical records. Dr. Funk did not charge a fee for his consultation at CMCI on April 10. Dr. Kuhlman was aware that Dr. Funk routinely did not charge patients for ER evaluations. The fact that Dr. Funk did not charge is a small consideration for Dr. Kuhlman with patients who are uninsured or have cost concerns. And Dr. Kuhlman testified that he was concerned about Plaintiff's financial obligation for transportation if he had transferred Plaintiff and then Plaintiff did not have a ruptured globe.

The medical records also note that Plaintiff's wife was concerned about money and paying for a hotel in Garden City. Plaintiff's wife was able to get a credit card from Plaintiff's employer to help with expenses in Garden City.

### D.     Relevant Policies, Rules, and Practices of CMCI

CMCI has the following relevant policies, rules, and practices.

- <u>On-Call List Requirement</u>: Section 13.2(b) of CMCI's Medical Staff Rules and Regulations provides:

    > CMCI must maintain a list of Physicians who are on-call to provide treatment necessary to stabilize an individual with an emergent medical condition within the capabilities and capacity of the staff and the facility. When an emergent patient needs the services of a Physician on the on-call list, the on-call Physician or extender . . . must appear within 30 minutes from the presentation time of the patient.

5

- <u>On-Call List Practice:</u> CMCI maintains a call list for the ER. The list includes a physician hospitalist's name and the name of a general surgeon. Specialists in fields such as ophthalmology have staff privileges at CMC. They may visit weekly or monthly to provide services, but they are not expected to come to the facility on other days. They are available for consultation during business hours when they're scheduled at the hospital. ER doctors at CMCI do not call the ophthalmologists with staff privileges for emergency consultation as a common practice.

- <u>ER Available Resources:</u> The Medical Staff Rules and Regulations state, "The resources of the hospital and staff generally available to patients are considered available for emergency departments."

- <u>Medical Screening Examination:</u> CMCI Medical Staff Bylaws Section 10.4 requires emergency medical treatment exams: "All persons who come to the Hospital for treatment shall be afforded a screening examination to determine whether a medical emergency exists and to treatment until any medical emergency is stabilized or to an appropriate transfer." The same provision also specifies who is authorized to conduct these examinations: "In addition to Physicians, resident physicians, nurse practitioners, and physicians' assistants[] are authorized to conduct a medical screening exam which is given to determine whether a medical emergency exists."

- <u>CMCI's EMTALA-Related Rules:</u> There are several relevant EMTALA provisions in the Medical Staff Rules and Regulations:

    o A "medical screening examination" is defined as follows:

    > the process that is required to reach the determination with a reasonable degree of clinical confidence, as to whether the patient has an emergency medical condition. A medical screening examination is a spectrum ranging from a very simple to a more complex process. It may consist of as little as brief history and physical to the full use of ancillary services depending upon the situation. It is an ongoing process, not an isolated event. . . . This screening must be universally applied to all patients complaining of the same condition. Individuals qualified to conduct a medical screening examination are listed in section 13.3 of these Rules and Regulations.

    o If CMCI's medical screening examination results in a determination that "the patient has an emergency medical condition, the Hospital will provide treatment to stabilize the medical condition within the capacity and capabilities of the staff and facilities or will arrange for a certified transfer of the individual to an appropriate medical facility."

- o  "To stabilize" refers to ensuring stabilization for transfer or discharge. CMCI's physicians must stabilize a patient when they have "knowledge that the patient is suffering from an emergency medical condition. To stabilize is to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer . . . ."

- o  "Stable for discharge" means "that the patient has reached the point where continued care, including diagnostic work-up or treatment, could be reasonably performed as an outpatient or later as an inpatient." A plan for follow-up care and discharge instructions are required.

- o  "Capabilities" means "the hospital's physical space, equipment, and supplies, as well as services made available by the hospital such as trauma care, surgery, intensive care, pediatrics, obstetrics, or radiology." Rule 13.1 also notes that "the hospital's capabilities to provide a medical screening examination and/or stabilizing treatment may be impacted by the availability of specialists and subspecialists at any particular time."

- CMCI's Consultation Rules: Section 4.8(b) of Article IV of CMCI's rules provides this guidance on consultation: "[F]or emergent requests for consultation, the referring Physician must personally contact the consulting Physician. There must be actual verbal communication Physician to Physician. The consulting Physician must see the patient within a timeframe appropriate to the patient's needs, and agreed upon by the involved Physicians."

Docs. 123-3 (rules), 123-4 (bylaws).

### E.   Plaintiff's Purported Disputed Facts

Plaintiff moves for summary judgment in his own favor. But Plaintiff also claims that the following facts are disputed and preclude summary judgment for CMCI:

- CMCI's capacity to provide specialty physicians for ER evaluation, including Consulting Staff like Dr. Bill Clifford;

- Whether consultation with non-physicians is prohibited by CMCI's bylaws, rules, or policies;

- Whether CMCI's ER resources equal all hospital resources;

- Who is permitted to conduct medical screenings;

- How Dr. Kuhlman usually conducts evaluations of eye trauma patients;

7

- The nature and content of Dr. Funk's phone call with Dr. Fry;

- Whether Dr. Fry's deposition testimony about Plaintiff's injury and what Dr. Fry would have known or done is admissible for purposes of summary judgment;[2]

- The reasons why Dr. Kuhlman made a judgment call not to share the information in the CT scan report with Dr. Funk or Dr. Fry;

- Whether a CT scan can rule out a ruptured globe;

- Whether Dr. Fry assumed responsibility for Plaintiff's care while speaking to Dr. Funk; and

- Whether Plaintiff was "stable for discharge" on April 10, 2019.

Despite proposing this list of allegedly disputed facts, Plaintiff maintains that he is entitled to summary judgment. The Court questions how Plaintiff can maintain this position if he also views these facts as controverted. The Court ultimately concludes they are not all controverted. And they are not all material. But CMCI, not Plaintiff, is entitled to summary judgment on the uncontroverted material facts.

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567,

---

[2]  The Court has resolved Plaintiff's challenge to Dr. Fry. Doc. 177.

8

569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

A court views each motion separately in a light most favorable to the non-moving party when parties file cross-motions for summary judgment. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016). The denial of one motion does not require the grant of the other. *Id.* at 907.

### III.   ANALYSIS

Plaintiff claims that CMCI violated EMTALA in two ways. First, Plaintiff claims CMCI failed to make an appropriate medical screening examination because CMCI violated its own policies and did not use its standard screening procedures. Second, Plaintiff claims CMCI knew of Plaintiff's emergency medical condition and released him without first stabilizing the condition.

Congress enacted EMTALA to address the issue of hospitals trying to minimize costs by "dumping" patients with emergency conditions before they are appropriately examined. *See Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013). EMTALA imposes two obligations on hospitals: (1) the hospital must examine everyone who comes to the emergency room seeking treatment, and (2) the hospital usually must stabilize the patient before transfer or release if the patient is suffering from an emergency medical condition. *Id.*; *see also* 42 U.S.C. § 1395dd(a)-(c). "[T]he basic statutory point is plain: a patient requiring emergency care may not be dumped on another hospital when there is no medical justification for doing so." *Genova*, 734 F.3d at 1097. But EMTALA is not directed at malpractice or negligence claims. *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994). It doesn't offer a remedy for inaccurate or inadequate diagnosis. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798 (10th Cir. 2001). A plaintiff must establish that the hospital treated him differently than others in like circumstances.

*Palmer v. Shawnee Mission Med. Ctr.*, 355 F. Supp. 3d 1003, 1016 (D. Kan. 2018) (citing *Repp*, 43 F.3d at 522). But no motive is necessary for EMTALA liability. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 252-54; *Repp*, 43 F.3d at 522 n.5.

      A.      **Did CMCI Provide an Appropriate Medical Screening Examination?**

Plaintiff first argues that CMCI didn't provide an appropriate medical screening examination. EMTALA states:

> if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). The term "appropriate medical screening examination" is not defined. But the purpose of the exam is to assess whether an emergency medical condition exists. *Collins v. DePaul Hosp.*, 963 F.2d 303, 306-07 (10th Cir. 1992). "Nothing more, nothing less." *Id.* And "appropriate medical screening examination" is modified by "within the capability of the hospital's emergency department." This means there is no uniform standard. It varies with the conditions of individual emergency departments. A hospital thus fulfills its examination requirement by using its standard screening procedures. *Repp*, 43 F.3d at 523. But a slight deviation or de minimis variation from standard procedure is not sufficient to show an actionable violation of policy. *See id.* And it doesn't matter if the standard procedures are inadequate; the only question is whether the hospital adhered to them. *Id.* at 522 n.4.

Plaintiff's medical screening examination in the CMCI ER consisted of the following actions:

- A nurse (Moss) conducted a triage exam.

10

- A physician assistant (Keller) conducted an exam. Keller tried unsuccessfully to contact a specialist (Dr. Fry) for advice.

- A physician (Dr. Kuhlman) conducted an exam. Dr. Kuhlman contacted a local optometrist (Dr. Funk), who had privileges to evaluate ER patients.

- Dr. Kuhlman ordered a CT scan, which was performed and interpreted by a radiologist.

- Dr. Funk came to the ER and used modalities beyond Dr. Kuhlman's capacity to examine Plaintiff's eye, including a slit lamp exam and a Seidel test. Dr. Funk then contacted and spoke with Dr. Fry, an ophthalmological surgeon. Dr. Fry agreed to see Plaintiff the next morning.

- Dr. Funk left the hospital before Dr. Kuhlman received the CT scan results. But Dr. Kuhlman, in his medical judgment, decided not to update Dr. Funk or Dr. Fry with the results because he did not believe the CT scan offered any new relevant information.[3] The CT scan showed "right intraocular hemorrhage and possible component of right globe rupture." And the CT report included a finding that "[t]he margins of the right globe are somewhat irregular, and some degree of right globe rupture possible."

- Dr. Kuhlman discussed the CT scan results with Plaintiff and discussed risks and options. He did not recommend using emergency transportation to immediately go to an ER that had the capability to do surgery.

Plaintiff contends that the above-described actions were not "appropriate" because CMCI deviated from its standard procedures and failed to comply with its own policies. Specifically, Plaintiff argues that the following deviations from policy and procedure indicate he received disparate treatment in violation of EMTALA[4]:

- <u>First</u>, CMCI failed to follow its procedures and Dr. Kuhlman failed to follow his usual practice to make a referral to a specialty physician when Dr. Kuhlman asked Dr. Funk, an optometrist, to examine Plaintiff. Doc. 123 at 28, 32-33, 34.

- <u>Second</u>, CMCI didn't require its consulting staff ophthalmologists to be available for emergency consultation although their contract for privileges required it. *Id.* at 33.

---

[3] Plaintiff argues Dr. Kuhlman's motivation is suspect. But Plaintiff offers no evidence controverting Dr. Kuhlman's representation about why he did not share the CT scan results.

[4] Plaintiff's identified deviations from policy or standard practice conflate the different ways a hospital can violate EMTALA. Some go to the medical screening, but some come into play only after an emergency medical condition has been diagnosed.

11

- <u>Third</u>, CMCI violated its bylaws by failing to maintain a list of names and contact information for subspecialists. *Id.* at 33.

- <u>Fourth</u>, Dr. Kuhlman delegated the responsibility to identify Plaintiff's medical condition to Dr. Funk, who was not qualified under CMCI rules. *Id.* at 28, 34.

- <u>Fifth</u>, Dr. Kuhlman did not communicate directly with Dr. Fry about Plaintiff even though policy requires physician-to-physician communication. *Id.* at 28.

- <u>Sixth</u>, policy requires that emergency care be delivered in accord with the standard of care, but no one at CMCI could surgically explore the eye as soon as possible (which is the standard of care for a suspected ruptured globe). *Id.* at 35.

- <u>Seventh</u>, Dr. Kuhlman's practice was to forward diagnostic tests to a specialty physician, but he did not forward the CT imaging to Dr. Fry. *Id.* at 36-37.

Plaintiff's EMTALA expert, Dr. John Richard Ludgin, M.D., J.D., opines that CMCI violated these policies. But he does not opine on whether the violations were more than slight deviations from policy. He does not explain how using other resources (such as calling a specialist in another city) would have helped Dr. Kuhlman diagnose a ruptured globe at CMCI. And he identifies policies that were not violated as a matter of law.

Dr. Ludgin's expert report and testimony does not create a genuine issue of material fact on whether CMCI failed to provide an "appropriate medical screening examination within the capability of [its ER]." 42 U.S.C. § 1395dd(a). It is immaterial whether CMCI formalistically deviated from one or more of the policies or practices identified as long as an appropriate medical screening examination was provided.

The question is whether any of the deviations Dr. Ludgin identified are more than slight deviations from policy or practice. This is not a situation where Plaintiff received no medical screening examination at all. To the contrary, Plaintiff was seen by multiple health professionals who administered multiple tests in an effort to diagnose the injury and determine the recommended treatment. But despite these tests, Dr. Kuhlman was unable to confirm a diagnosis other than

"possible globe rupture." Plaintiff's federal claim for failing to provide an appropriate medical screening thus stands or falls on whether any deviations from policy and practice were de minimis. The Court concludes they were as would every reasonable jury. The Court briefly discusses each of the alleged deviations Plaintiff identified.

First, Dr. Kuhlman's recruitment of Dr. Funk's assistance did not violate CMCI's policies or bylaws. And it did not differ from his ordinary practice. Dr. Kuhlman testified that he often called an optometrist to help before talking with an ophthalmologist for eye injuries. Nothing in CMCI's rules prohibits CMCI from using additional resources to help in its screening process.

There is another problem with Plaintiff's first argument. CMCI correctly observes that this allegation conflates screening procedure with transfer rules. Doc. 150 at 33. A referral to a specialist at another facility is not part of the screening process. It is a transfer. It is illogical to require CMCI to transfer Plaintiff to complete his emergency medical screening. This would render meaningless the modifier "within the capability of the hospital's [ER]." Plaintiff's argument that Dr. Kuhlman's action conflicted with ER policy to "provide referral to specialty areas" is misguided and fails to establish a violation of policy.

Second, Plaintiff essentially argues that CMCI was required to make its specialty consulting physicians available for emergency consultations. CMCI doesn't have a policy or contract that requires various specialists to be available to immediately report for emergency consultation. They are not "ancillary services routinely available." Plaintiff himself identified several uncontroverted facts indicating that (1) specialty consulting physicians were not expected to be available for ER consultation and (2) regular practice was not to reach out to CMCI's consulting staff for ER consultation. *See, e.g.*, Doc. 123 at 33. Whether a different policy would have been better is not the issue. This is because what would be a "best practice" (as opposed to a

regular practice) is irrelevant for purposes of EMTALA. CMCI's bylaws only require that consulting staff be "willing and able to come to the Hospital <u>on schedule</u> or <u>respond promptly and in a reasonable time</u> when called to render clinical services within their areas of competence." Plaintiff repeats the mantra that "[t]he resources of the hospital and staff generally available to patients are considered available for emergency departments." Doc. 147 at 1 (citing CMCI Rules Section 13.2(b)). But this rule does not <u>require</u> that hospital consulting physicians be called and available for emergencies.[5] CMCI's corporate representative Jenn Niblock testified that the ER had more flexibility for this reason—to allow staff to contact outside physicians who may best be able to respond quickly. That is what occurred here. No reasonable jury could find a policy violation or disparate treatment under these facts.

<u>Third</u>, the ER was not required to keep a list of specialists. There is a requirement of an "on-call list," but nothing determines how many providers or what type of providers it must include. And the ER does keep a list of general surgeons, who are "ancillary services routinely available."[6] Doc. 127 at 24. Moreover, as CMCI notes, a list of doctors from other cities would not have mattered here because CMCI still lacked the ability to diagnose a ruptured globe within its facility. Doc. 150 at 34.

<u>Fourth</u>, Plaintiff claims Dr. Kulhman delegated the responsibility to identify Plaintiff's medical condition to Dr. Funk, who was not qualified under CMCI rules. But Dr. Kuhlman still took full responsibility for Plaintiff's screening. He signed the emergency room record. This is not

---

[5] Plaintiff represents that this is "in contravention of their contract for privileges." Doc. 123 at 33. But the cited evidence for this statement does not support the statement.

[6] It is worth noting that this list did not help Plaintiff here because the general surgeon was not equipped to diagnose or operate on Plaintiff at CMCI.

a situation in which he or P.A. Keller were not involved in the examination at all. No reasonable jury could find that consulting Dr. Funk violated policy.[7]

Fifth, if Dr. Kuhlman's failure to communicate directly with Dr. Fry deviated from policy, it was a de minimis deviation. Section 4.8 of the Medical Staff Rules and Regulations require physician-to-physician communications for "emergent consultations." CMCI represents that Section 4.8 relates to inpatient consultations, per Niblock. But CMCI did not direct the Court to where that testimony is in the record. Plaintiff cites its own statements of fact in response. But those numbered statements do not support a finding that Section 4.8 applies to ER calls to a provider who lacks an obligation to respond. The Court cannot discern from the record whether Section 4.8 applies. But if it does, the fact that Dr. Funk called Dr. Fry instead of Dr. Kuhlman is not the type of deviation that implicates EMTALA.

Sixth, Plaintiff essentially imports a malpractice standard by citing CMCI policy that requires that emergency care be delivered in accord with the standard of care. But if a breach of this policy provision was sufficient to prove a violation of EMTALA, then the medical malpractice standard would equal the EMTALA standard—a result that Congress rejected. Additionally, the standard of care for a suspected ruptured globe is surgical exploration. But no one at CMCI could surgically explore the eye as soon as possible. It therefore would have been impossible for CMCI to satisfy EMTALA if doing so required surgical exploration. Consistent with other courts and Congressional intent, this Court agrees that the standard of ophthalmological care is irrelevant to the EMTALA inquiry.[8] *See, e.g.*, *Stiles v. Tenet Hosps. Ltd.*, 494 F. App'x 432, 437 (5th Cir. 2012);

---

[7] It seems illogical to discourage ERs from using available outside resources to help with specialty medicine. Having Dr. Funk respond was a benefit and not a detriment to Plaintiff when Dr. Kuhlman was less familiar with the proper tests to utilize.

[8] Plaintiff states, "The Tenth Circuit defines 'appropriate medical screening' under EMTALA as the equivalent to applicable medical malpractice standard . . . ." Doc. 123 at 26. Plaintiff cites *Griffith v. Mt. Carmel Medical Center*, 831 F. Supp. 1532, 1543 (D. Kan. 1993), in support. But *Griffith* does not suggest that the standards are the same.

*Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 487 (S.D. Tex. 2009), *aff'd*, 409 F. App'x 769 (5th Cir. 2011); *Hoffman v. Tonnemacher*, 425 F. Supp. 2d 1120, 1135 (E.D. Cal. 2006).

Seventh, Dr. Kuhlman made the judgment not to forward the CT results to Dr. Fry. Plaintiff contends that this deviates from Dr. Kuhlman's regular practice. Dr. Kuhlman did testify that his regular practice was to forward all the information gathered to specialty physicians so they would have all the information they needed. But here, Dr. Kuhlman explained the decision not to forward the CT results. He did not think it added anything new to the review of Plaintiff's injury. And Dr. Fry testified that having the CT results would not have changed his recommended action.[9] Again, no reasonable jury could find this was more than a de minimis deviation.

In sum, the identified policy violations don't show that Plaintiff was the victim of disparate treatment. They represent at most slight deviations and are insufficient as a matter of law to establish an EMTALA violation. *See, e.g.*, *Kilroy v. Star Valley Med. Ctr.*, 237 F. Supp. 2d 1298 (D. Wyo. 2002). In contrast, a First Circuit case illustrates a substantial variation from hospital policy. In *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995), the hospital failed to provide an appropriate medical screening examination because a patient arrived at the ER with chest pains. She waited for over two hours without treatment, and there was no written record of her visit. Policy required staff to promptly take vital signs, make written records, and refer critical cases to a doctor. The hospital took none of those actions. This case bears no resemblance to *Correa*.

---

It merely held that the hospital's lack of standard screening procedures did not limit the ways the plaintiff could identify differential treatment.

[9] The Court ruled that Dr. Fry's testimony and affidavit can be considered. But even had the Court reached the opposite conclusion, the outcome does not change. There is ample evidence supporting summary judgment without considering Dr. Fry's testimony or affidavit.

Plaintiff also points to testimony that allegedly demonstrates evidence of bias. Specifically, he cites (1) the fact that Dr. Funk responded to the ER for "free"; (2) Dr. Funk's concern that he did not want to "waste" a surgical team on a "possible" ruptured globe; and (3) Dr. Kuhlman's concern about a five-figure transportation bill. Knowledge of Plaintiff's lack of insurance or ability to pay may be relevant to explain why procedures weren't followed. But it is not sufficient on its own to state an EMTALA claim. *Phillips*, 244 F.3d at 979-98. Here, Plaintiff does not show that this information impacted Dr. Kuhlman's care.

No reasonable jury could find that CMCI denied Plaintiff an appropriate medical screening examination. The Court grants summary judgment to CMCI on this theory of an EMTALA violation.

      **B.    Did CMCI Know of Plaintiff's Emergency Medical Condition and Release Plaintiff without First Stabilizing the Condition?**

Plaintiff's second argument is that CMCI knew Plaintiff had a ruptured globe but released him without first stabilizing the condition. EMTALA provides:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either – (A) . . . for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility . . . ."

42 U.S.C. § 1395dd(c). But a hospital only violates EMTALA if the hospital <u>actually knew</u> of the emergency medical condition. *Urban ex rel. Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994) ("The statute's stabilization and transfer requirements do not apply until the hospital determines the individual has an emergency medical condition."). The standard is subjective. A possible diagnosis or inclusion in a differential diagnosis does not equate to CMCI's <u>actual knowledge</u> that Plaintiff had a ruptured globe. *See Guzman*, 637 F. Supp. 2d at 505-06; *Garrett v. Detroit Med.*

*Ctr.*, 2007 WL 789023, at *6 (E.D. Mich. 2007); *Hoffman*, 425 F. Supp. 2d at 1141-42; *Harris v. Health & Hosp. Corp.*, 852 F. Supp. 701, 703 (S.D. Ind. 1994).

Plaintiff claims his emergency medical condition was a ruptured globe. He argues that CMCI violated EMTALA if providers knew he had this emergency medical condition, i.e., a ruptured globe, but discharged him without stabilizing him. CMCI generally agrees with this premise. Likewise, CMCI agrees that if ophthalmological standards of care dictate what is required under EMTALA, then they failed to satisfy EMTALA.

Where the parties diverge is the significance of Plaintiff having a "possible ruptured globe" or "suspected ruptured globe." Plaintiff generally ignores any distinction in these adjectives. But when an actual knowledge standard applies, these adjectives must be given meaning. They are terms that indicate that knowledge of a condition is not present.[10]

Niblock testified that Plaintiff had an emergency medical condition when he presented to the ER. This condition was confirmed when Dr. Nesmith conducted surgery on Plaintiff. But the issue here is whether CMCI <u>knew</u> that Plaintiff had an emergency medical condition <u>when he was released</u>. Stated differently, <u>having</u> a (hidden) ruptured globe is not the same thing as <u>knowing</u> that there is a ruptured globe.

Plaintiff claims that the hospital knew at 5:25 p.m., when the radiologist read Dr. Kuhlman the CT results: "the margins of the right globe are somewhat irregular" and "some degree of right globe rupture possible."[11] Doc. 176 at 7. Dr. Kuhlman discussed the "diagnosis" with Plaintiff, which Plaintiff claims "means he identified Plaintiff's condition from the CT results with a certain

---

[10] Dr. Ludgin represents in his report that the distinction between a "possible" ruptured globe, a "probable" ruptured globe, and an "apparent" ruptured globe is of no consequence. He cites Dr. Nesmith's deposition testimony that there is no significance in the word "possible." Doc. 147-18 at 30.

[11] Plaintiff misrepresents the results of the CT scan. He repeatedly refers to the results as definitively finding he had a ruptured globe. *See, e.g.*, Docs. 123 at 39; 147 at 17, 21, & 22. That is not what the results say.

18

level of clinical confidence." Doc. 147 at 22. But the evidence Plaintiff cites in support of this statement does not suggest Dr. Kuhlman diagnosed a ruptured globe or had actual knowledge that the globe was ruptured. The only test results Dr. Kuhlman had showed a <u>possible</u> ruptured globe. And the deposition testimony Plaintiff cites even uses the terminology "possible ruptured globe." *See* Doc. 147-8 at 14. There is no evidence in the record that Dr. Kuhlman diagnosed an actual ruptured globe.

Dr. Ludgin testified that Dr. Kuhlman should have transferred Plaintiff immediately when the CT scan added "ruptured orbit" to the differential diagnosis. But the CT scan did not <u>add</u> a ruptured globe to the differential diagnosis. Dr. Kuhlman testified that a possible ruptured globe was already in his differential diagnosis. Drs. Funk and Fry agreed that was a possibility, even without the aid of the CT scan result. The CT scan report only confirmed that a ruptured globe was possible—not that it had affirmatively occurred. There is simply no evidence in the record that CMCI <u>knew</u> Plaintiff had a ruptured globe, i.e., an emergency medical condition, versus just a possible ruptured globe. Knowledge of an emergency medical condition is a prerequisite for a duty to stabilize before release or transfer under EMTALA. There is no obligation of stabilization for possible conditions in the differential diagnosis.[12]

Plaintiff further urges the Court to find knowledge as a matter of law through the willful blindness doctrine. Doc. 176 at 7-9. This argument about "willful blindness" is not properly before the Court as Plaintiff raised it for the first time in his reply. In any event, Plaintiff rationalizes that knowledge can be inferred if the "provider willfully buried his head in the sand." *Id.* at 8. And Plaintiff contends that Dr. Funk was CMCI's agent and "took deliberate action to avoid confirming

---

[12] Plaintiff represents that "[i]t is undisputed that CMCI knew Plaintiff was suffering from a ruptured globe." Doc. 123 at 37. But Plaintiff does not support this conclusory statement with evidence of knowledge. Nor does Plaintiff identify any available resource in the hospital that was not utilized.

19

the possibility of a ruptured globe, by not calling in surgical resources so as not to waste resources or waiting for the CT results." *Id.* at 8. But there is not any evidence suggesting that Dr. Funk "willfully buried his head in the sand." Plaintiff's allegation of willful blindness is nothing more than a conclusory allegation.

## IV.  CONCLUSION

It is sometimes a question for the jury whether an ER violated EMTALA. *See, e.g.*, *Griffith*, 831 F. Supp. 1532; *Southard v. United Reg'l Health Care Sys., Inc.*, 2008 WL 5049299 (N.D. Tex. 2008). But here it is not. The evidence demonstrates that CMCI gave Plaintiff an appropriate medical screening examination and did not determine that Plaintiff had an emergency medical condition. CMCI acted within its capacity and complied with federal law in carrying out its actions. Plaintiff may believe that CMCI's diagnosis and treatment was wrong. But that is a matter for his state-law medical malpractice claims. It does not create a viable federal claim.

THE COURT THEREFORE ORDERS that CMCI's motion for summary judgment on EMTALA claims (Doc. 124) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment on EMTALA claims (Doc. 122) is DENIED.

IT IS SO ORDERED.

Dated: October 10, 2023         /s/ *Holly L. Teeter*
                                HOLLY L. TEETER
                                UNITED STATES DISTRICT JUDGE